16-4061
Oxford University Bank et al. v. Lansuppe Feeder, Inc.

UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

August Term, 2017

(Argued: November 13, 2017      Decided: August 5, 2019)

Docket No. 16-4061

_____

Oxford University Bank, Citizens Bank & Trust Company of Marks, Coastal Commerce Bank, Guaranty Bank and Trust Company, BankFirst Financial Services, as Successor-in-Interest to Newton County Bank, The First, A National Banking Association, Copiah Bank, N.A., PriorityOne Bank, Bank of Morton, Bank of Kilmichael, First Commercial Bank, First State Bank,

*Intervenors - Cross-Claimants - Appellants,*

Holmes County Bank and Trust Company,

*Intervenor - Cross-Claimant,*

Wells Fargo Bank, National Association, as trustee for Soloso CDO 2005-1 Ltd., Soloso CDO 2005-1 Ltd.,

*Defendants - Cross-Defendants,*

v.

Lansuppe Feeder, LLC,

*Plaintiff - Appellee.*

_____

Before:

PIERRE N. LEVAL, PETER W. HALL, *Circuit Judges*, and COLLEEN McMAHON, *District Judge*.*

Intervenors, financial institutions that hold junior notes issued by trust defendant Soloso, appeal from the grant of summary judgment in favor of Plaintiff, senior noteholder Lansuppe, and the denial of Intervenors' cross-motion for summary judgment and dismissal of Intervenors' cross-claims by the United States District Court for the Southern District of New York (Laura Swain, *J.*). The district court ordered distribution of the assets of the trust according to the terms of the trust's governing Indenture. AFFIRMED.

> ANDREW STUART CORKHILL, Quinn Emanuel Urquhart & Sullivan LLP, New York, N.Y. (Jonathan Edward Pickhardt and Blair Alexander Adams, Quinn Emanuel Urquhart & Sullivan LLP, New York, N.Y., on the brief), *for Plaintiff-Appellee*.
>
> ROBERT B. BIECK, JR., Jones Walker LLP, New Orleans, L.A., (Peter Dee, Mavronicolas & Dee LLP, New York, N.Y., on the brief), *for Intervenors-Cross-Claimants-Appellants*.

LEVAL, *Circuit Judge*:

This is an appeal by Intervenors, entities which hold junior notes issued by nominal Defendant Soloso CDO 2005-1 Ltd., from the judgment of the United States District Court for the Southern District of New York (Laura

---

* Judge Chief Judge Colleen McMahon, United States District Court for the Southern District of New York, sitting by designation.

Swain, *J.*), which granted summary judgment in favor of Plaintiff, senior noteholder Lansuppe Feeder LLC, and which denied Intervenors' cross-motion for summary judgment and dismissed Intervenors' cross-claims.

The case arises from a dispute between Lansuppe and Intervenors related to the liquidation and disposition of the assets of the Soloso trust. Lansuppe, which holds more than two-thirds of a class of senior notes issued by Soloso, initiated this trust instruction proceeding to seek a declaratory judgment and an order of specific performance directing Wells Fargo Bank, as Trustee, to liquidate the trust's assets and distribute the proceeds pursuant to the trust Indenture. If the liquidated assets are distributed according to the Indenture scheme, senior noteholders will be substantially compensated for their investment, while junior noteholders will receive nothing. Intervenors cross-claimed, alleging that Soloso violated the Investment Company Act of 1940 ("ICA"), 15 U.S.C. § 80a *et seq.*, thereby entitling them to rescission of their investment in notes issued by Soloso, under ICA § 47(b), or in the alternative to *pro rata* distribution of Soloso's assets. The district court granted summary judgment in favor of Lansuppe, finding that ICA § 47(b) does not

create a private right of action, and that even if it did, Intervenors' cross-claims fail on the merits.

We conclude that the district court erred in finding that ICA § 47(b) does not provide a private right of action. However, we agree with the district court that Lansuppe has demonstrated that it is entitled to summary judgment ordering distribution of Soloso's assets according to the terms of the Indenture and that Intervenors' cross-claims fail. Accordingly, we affirm the district court's grant of summary judgment to Lansuppe, denial of summary judgment to Intervenors, and dismissal of Intervenors' cross-claims, albeit on the different ground that Intervenors failed to state a claim under the ICA.

BACKGROUND

I. Facts

Soloso is a special purpose investment vehicle. It issued notes to investors pursuant to the terms of an Indenture dated August 24, 2005. Using proceeds from its sale of the notes, Soloso purchased Trust Preferred Securities ("TruPS"), which it held as collateral to secure its obligations to noteholders, and which generated interest used to pay noteholders a return on their investment. Soloso's notes include Class A-1 Notes ("senior notes"),

4

as well as several tranches of junior notes. Plaintiff Lansuppe holds senior notes, which are entitled to priority of payment in the event of a liquidation, whereas the Intervenors hold junior notes, which receive a higher rate of return but lower priority of payment in relation to senior notes. Intervenors did not purchase their junior notes directly from Soloso, but rather on the secondary market.

In April 2013, Soloso failed to pay the periodic interest due on senior notes, which constituted, according to the terms of the Indenture, an "Event of Default." Indenture § 5.1(a)(iii)(A). The occurrence of an Event of Default triggers certain noteholder rights, including the right of holders of two-thirds of the senior notes (the "Requisite Noteholders") to direct the Trustee to liquidate the trust's assets. *Id.* § 5.2(a). Lansuppe, which holds more than two-thirds of the senior notes and thus qualifies as the Requisite Noteholders, directed the Trustee on July 31, 2015 to liquidate the estate. Under the distribution scheme set forth in the Indenture's "Waterfall Provision," the Trustee is to use the liquidated assets first to satisfy outstanding obligations to senior noteholders, and second—if any assets remain—to satisfy outstanding obligations to junior noteholders. *Id.* §§ 5.4, 11.1. Prior to liquidation, the

Trustee notified all noteholders that the Requisite Noteholders had instructed it to liquidate and distribute trust assets.

Junior noteholders—now Intervenors in this action—objected to the planned liquidation on the ground that Soloso had violated the ICA by issuing notes to a purchaser who was not a "Qualified Purchaser" within the meaning of the ICA. *See* 15 U.S.C. § 80a-3(c)(7). The ICA requires investment companies to register with the Securities and Exchange Commission ("SEC") but exempts from this requirement issuers whose notes are owned only by persons who at the time of their acquisition were Qualified Purchasers under the ICA. *Id.* § 80a-3(c) ("[N]one of the following persons is an investment company . . . (7)(A) Any issuer, the outstanding securities of which are owned exclusively by persons who, at the time of acquisition of such securities, are qualified purchasers . . ."). The Indenture contains provisions meant to ensure that Soloso remains exempt from the ICA's registration requirement, including, as relevant here, that notes may be sold or transferred only to Qualified Purchasers as defined under the ICA, and that "no transfer of a Note . . . may be made if such transfer would require registration of the Issuer or Co-Issuer under the [ICA]." Indenture § 2.5(d). Additionally, according to

6

the terms of the Indenture, a purchaser of Soloso securities is deemed to have represented that it is a Qualified Purchaser. *Id.* § 2.5(i).

The basis for the junior noteholders' objection is its claim that certain notes issued by Soloso were resold by initial purchasers from Soloso to an entity (Bank of Morton) that was not a Qualified Purchaser.[1] As a result of this resale to a purported non-Qualified Purchaser, and in light of Soloso's reliance on the exemption for issuers that sell notes only to Qualified Purchasers, junior noteholders argued that the transfer of a note to Bank of Morton constituted an Event of Default under § 5.1(e) of the Indenture. According to junior noteholders, the Trustee could not proceed with liquidation and distribution on the basis of the Requisite Noteholders' instruction because of this alleged Event of Default.[2] In light of the dispute, the Trustee requested a judicial determination of its obligations under the Indenture before proceeding with the liquidation. Plaintiff disputes the consequences that would flow from such a transfer under the ICA and the

---

[1] Intervenors have since identified additional alleged non-Qualified Purchasers who bought notes in 2005.

[2] At the time junior noteholders objected, they claimed that because of the alleged Event of Default, liquidation and distribution required approval of 100% of noteholders, rather than approval of only the Requisite Noteholders. In this litigation, junior noteholders abandoned their claim that liquidation required approval of 100% of noteholders, and have instead sought rescission, or, in the alternative, *pro rata* distribution.

7

Indenture, as well as that notes were transferred to any non-Qualified Purchaser.

## II.  Procedural History

In an earlier-filed action, the Intervenors brought suit against the Trustee in the U.S. District Court for the Northern District of Mississippi, seeking injunctive relief to prevent the liquidation. *Oxford University et al. v. Wells Fargo Bank*, No. 3:15-cv-00145 (N.D. Miss. filed Aug. 24, 2015). While that case was pending, Lansuppe initiated this trust instruction action in the Southern District of New York, alleging that the court in Mississippi lacked jurisdiction over two necessary parties—Soloso and Lansuppe—and that Mississippi was therefore not a proper venue for Intervenors' ICA claim.[3]

Lansuppe filed a motion for summary judgment on its complaint in the New York action, seeking a judicial construction of the Indenture to the effect that Requisite Noteholders were entitled to direct liquidation, and an order for specific performance. Intervenors filed an unopposed motion to intervene

---

[3] Initially, Intervenors sought to dismiss or transfer the New York action in light of the earlier-filed Mississippi action. In an order dated October 26, 2015, the district court in New York denied Intervenors' motion to dismiss or transfer. Shortly thereafter, Intervenors voluntarily dismissed the Mississippi action.

and cross-claimed for summary judgment on their ICA claims.[4] In their cross-claim, Intervenors sought a declaration that Soloso's failure to register violated ICA §§ 7 and 8, and entitled Intervenors to rescission pursuant to § 47(b) the ICA.

The district court granted the motion to intervene, and granted partial summary judgment for Lansuppe, directing the Trustee to liquidate the trust estate to preserve the value of the trust and further directing the Trustee to hold the assets pending resolution of this dispute. It is undisputed that if the liquidated trust assets are distributed in accordance with the Indenture, such distribution will largely satisfy senior noteholders' claims but will be insufficient to fund any distribution to Intervenors. In subsequent orders, the district court granted summary judgment in Lansuppe's favor, denied Intervenors' cross-motion for summary judgment, and dismissed Intervenors' claim seeking rescission. This appeal followed.

---

[4] In the New York action, Intervenors identified, for the first time, additional entities—Bank of Kilmichael, Commercial Bank (Dekalb), Desoto County Bank (now known as First Commercial Bank), First State Bank, and Holmes County Bank—that Intervenors claim were non-Qualified Purchasers at the time they purchased Soloso notes.

DISCUSSION

We review a district court's grant of summary judgment *de novo*, "resolv[ing] all ambiguities and draw[ing] all [reasonable] factual inferences in favor of the party against whom summary judgment is sought." *Johnson v. Killian*, 680 F.3d 234, 236 (2d Cir. 2012) (per curiam) (quoting *Terry v. Ashcroft*, 336 F.3d 128, 137 (2d Cir. 2003)). The movant bears the burden of "demonstrat[ing] the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "[W]e may affirm the judgment of the district court on any ground appearing in the record." *Boy Scouts of Am. v. Wyman*, 335 F.3d 80, 90 (2d Cir. 2003).

I.      Private Right of Action

The parties dispute whether Intervenors have a private right of action to seek rescission for alleged violations of the ICA's registration requirement that arise from the sale of notes to non-Qualified Purchasers. Intervenors base their claim for rescission on § 47(b).

Section 47(b) provides, in relevant part:

Validity of Contracts

(1) A contract that is made, or whose performance involves, a violation of this subchapter . . . is unenforceable by either party . . . .

10

(2) To the extent that a contract described in paragraph (1) has been performed, a court may not deny rescission at the instance of any party unless such court finds that under the circumstances the denial of rescission would produce a more equitable result than its grant and would not be inconsistent with the purposes of this subchapter.

15 U.S.C. § 80a-46(b).

The Supreme Court stated in *Alexander v. Sandoval* that "private rights of action to enforce federal law must be created by Congress." 532 U.S. 275, 286 (2001). In determining whether Congress has created a private right of action, "the interpretive inquiry begins with the text and structure of the statute[.]" *Id.* at 288 n.7. "[S]tatutory intent . . . is determinative." *Id.* at 286; *accord Lopez v. Jet Blue Airways*, 662 F.3d 593, 596 (2d Cir. 2011).

Referring to factors noted in *Bellikoff v. Eaton Vance Corp.*, 481 F.3d 110 (2d Cir. 2007) (per curiam), the district court found that "Intervenors have no private right of action under Section 47(b) of the ICA." *Lansuppe Feeder, LLC v. Wells Fargo Bank*, NA, No. 15-CV-7034-LTS, 2016 WL 5477741, at *4 (S.D.N.Y. Sept. 29, 2016). In *Bellikoff*, we considered whether the ICA provided a private right of action in a suit alleging violations of other provisions of the ICA, none of which are at issue in this appeal. 481 F.3d at 115. After noting that none of the statutory provisions at issue explicitly provided a cause of action, we

11

listed three considerations that "buttressed" the conclusion that Congress did not intend to create an implied private right of action for the plaintiffs' claims. *Id.* at 116. These considerations were (i) that Congress had provided an alternate means of enforcing the relevant provisions, namely, investigations and civil actions instituted by the Securities and Exchange Commission (SEC), *see id.* ("[T]he express provision of one method of enforcing a substantive rule *suggests* that Congress intended to preclude others . . . .") (emphasis added and alterations omitted) (quoting *Sandoval*, 532 U.S. at 290); *see also* 15 U.S.C. § 80a-41 (authorizing SEC enforcement for violation of "any provision" of the ICA); (ii) that Congress expressly provided a cause of action for enforcing one section of the statute, § 35(b), "suggest[ing] that omission of any explicit private right to enforce other sections was intentional," *see id.* (quoting *Olmsted v. Pruco Life Ins. Co.*, 283 F.3d 429, 433 (2d Cir. 2002)); and (iii) that the provisions allegedly violated did not contain "rights-creating language" because they spoke only of imposing obligations on "regulated entities," and "statutes that focus on the person regulated rather than the individuals protected create no implication of an intent to confer rights on a particular

class of persons." *See id.* (quoting *Sandoval*, 532 U.S. at 289) (alterations omitted).

In the district court's analysis, Intervenors have no private right of action under § 47(b) for the same three reasons as this court articulated in *Bellikoff*: (i) the ICA provides a different enforcement mechanism, through the SEC, of the provisions at issue; (ii) the ICA expressly provides for private enforcement in a different provision, § 36(b); and (iii) "there is 'no implication of an intent to confer rights' on the Intervenors as a protected 'particular class of persons.'" *Lansuppe Feeder*, 2016 WL 5477741, at *4 (quoting *Bellikoff*, 481 F.3d at 116). We respectfully disagree with the district court's analysis.

The proposition that the *Bellikoff* plaintiffs did not have a private right of action for damages does not support the conclusion that Intervenors here have no private right of action for rescission. The district court erred in its application of the third *Bellikoff* factor, and in so doing, overlooked clear evidence of Congressional intent to provide a right of action: the text of § 47(b) itself.

The text of § 47(b) unambiguously evinces Congressional intent to authorize a private action. Both subsections of § 47(b) indicate that a party to

an illegal contract may seek relief in court on the basis of the illegality of the contract. Section 47(b)(1) renders contracts that violate the ICA "unenforceable by either party" to the violative contract, 15 U.S.C. § 80a-46(b)(1), meaning at least that a party sued for failure to perform under such a contract may invoke the illegality of the contract as a defense. Section 47(b)(2), the provision on which Intervenors rely, provides that "a court may not deny rescission at the instance of *any party* . . . ." *Id.* § 80a-46(b)(2) (emphasis added). Although Congress did not expressly state that a party to an illegal contract may sue to rescind it, the clause that begins "a court may not deny rescission at the instance of any party" necessarily presupposes that a party may seek rescission in court by filing suit. The language Congress used is thus effectively equivalent to providing an express cause of action. *Cf.* LOUIS LOSS, FUNDAMENTALS OF SECURITIES REGULATION 919 (1988) (describing § 47(b)(2) as a provision with a "semi-express" cause of action).

In addition to presupposing the availability of a private right of action, § 47(b)(2) also identifies a "class of persons," *Bellikoff*, 481 F.3d at 116, who benefit from the availability of the right of action. The most natural reading of the clause providing for rescission, which appears in a section entitled

14

"Validity of Contracts" and provides a remedy that benefits a party to an illegal contract, is that "any party" refers to parties *to a contract whose provisions violate the ICA*. Section 47(b)(2) thus both indicates a "class of persons" and comes close to expressly stating that such persons have a private right of action for rescission. We therefore find that the third *Bellikoff* factor cuts in favor of finding a private right of action for Intervenors, and that the "determinative" statutory intent manifested by the terms of the statute is that parties to such a contract have a cause of action to rescind the violative contract. *Sandoval*, 532 U.S. at 286 ("[S]tatutory intent . . . is determinative.").

Lansuppe counters that the right to seek rescission might instead be that of a governmental actor, such as the SEC, and not of a private party. Appellee Br. 18-19. This is unpersuasive for three reasons. First, the phrase "any party" contemplates that more than one party may seek rescission. Lansuppe's interpretation, by contrast, would limit "any party" to one: the SEC. We consider it highly unlikely that Congress meant to allow a suit only by the SEC when it used a phrase that so unambiguously contemplates that more than one entity may seek rescission. Second, the context in which the

15

term appears further undermines Lansuppe's interpretation. Section 47(b)(2) cannot be read in isolation from § 47(b)(1), which provides that contracts that violate the ICA are unenforceable by parties to the contract. 15 U.S.C. § 80a-46(b). The next subsection, § 47(b)(2), provides the parallel remedy— rescission rather than non-enforcement—for violative contracts that have already been performed. 15 U.S.C. § 80a-46(b)(2) (providing a remedy in the event that "a contract described in paragraph (1) has been performed"). It is difficult to conceive of a reason why Congress would use the term "party" to mean one thing in § 47(b)(1) and so different a thing in § 47(b)(2). The context of the use of "any party" in § 47(b) strongly supports that it means any party *to a contract that violates the ICA*. Third, the ICA elsewhere refers to the SEC repeatedly as "the Commission" or "Commission," but never simply as a "party," *see, e.g.*, 15 U.S.C. § 80a-32; 15 U.S.C. § 80a-42; 15 U.S.C. § 80a-45, which supports that "any party" in § 47(b)(2) was not the statute's way of designating the SEC. The clear inference of § 47(b)(2) is that it provides a party to a contract that violates the ICA (or whose performance violates the ICA) the right to seek rescission of the violative contract.

As discussed below, the provision of other (private or public) enforcement mechanisms (*Bellikoff* factors (i) and (ii)) merely "suggests" "that Congress intended to preclude" implied private rights of action. *Sandoval*, 532 U.S. at 290. This suggestion can be overcome where, as here, the meaning of the text is clear. *BedRoc Ltd., LLC v. United States*, 541 U.S. 176, 183 (2004) ("[The statutory interpretation] inquiry begins with the statutory text, and ends there . . . *if the text is unambiguous*.") (emphasis added) (plurality opinion). Further, although the substantive provisions allegedly violated, which relate to the obligation of investment companies to register, focus on regulated entities and not a class of persons to be benefited (*Bellikoff* factor (iii)), the text of § 47(b) itself "unmistakabl[y] focus[es]" on the "identifiable class" that possesses a right of action—*i.e.*, "any party" to a contract that violates the ICA. *See Gonzaga Univ. v. Doe*, 536 U.S. 273, 284 (2002) (citations omitted). Thus, we conclude that § 47(b) provides an implied private right of action for rescission.

This conclusion finds support in the Supreme Court's interpretation of a similar provision in simultaneously-enacted "companion legislation" to the ICA, the Investment Advisors Act (IAA). In *Transamerica Mortgage Advisors*

*(TAMA) v. Lewis*, 444 U.S. 11 (1979), the plaintiffs, shareholders in a trust, alleged that the trust's investment advisors (TAMA) had violated the "federal fiduciary standards" set forth in § 206 "to govern the conduct of investment advisors." *Id.* at 17. The plaintiffs claimed they had a private right of action under § 215, "which provides that contracts whose formation or performance would violate the [IAA] 'shall be void . . . as regards the rights of' the violator." *Id.* at 16-17 (quoting 15 U.S.C. § 80b–15(b)). The IAA provided no express private right of action. The Court noted two factors that cut against finding an implied right of action. First, it acknowledged that the IAA provided for SEC enforcement in another provision. *Id.* at 15. Second, it recognized that the legislative history of the IAA was silent as to Congressional intent. *Id.* at 18.

Nonetheless, it found that, in providing that contracts violating the IAA were void, Congress intended to include a right to seek rescission as well:

> In the case of § 215, we conclude that the statutory language itself fairly implies a right to specific and limited relief in a federal court. By declaring certain contracts void, § 215 by its terms necessarily contemplates that the issue of voidness under its criteria may be litigated somewhere. At the very least Congress must have assumed that § 215 could be raised defensively in private litigation . . . . But the legal consequences of voidness are typically not so limited. A person with the power to void a contract ordinarily may resort to a court to

18

have the contract rescinded and to obtain restitution of consideration paid.

*Id.* at 18.

The Court went on to find that Congress intended "the customary legal incidents of voidness," including the availability of a suit for rescission, to follow from its identification of certain contracts as void. *Id.* at 19.[5]

At the time *TAMA* was decided, IAA § 215 was identical to ICA § 47(b). The following year, Congress amended § 47(b) in a manner that strongly implied that it endorsed the result in *TAMA*. Prior to the 1980 amendment, § 47(b) provided generally that contracts "made in violation of," or "the performance of which involves the violation of," the ICA "shall be void. . . ." Investment Company Act, 54 Stat. 845 (Aug. 22, 1940). The amended text, which is still in effect, distinguished between unperformed and performed contracts, consistent with *TAMA*'s interpretation of Congress's intent. It makes clear in § 47(b)(1) that illegality could be raised as a defense to enforcement ("A contract that is made, or whose performance involves, a violation of this subchapter . . . is unenforceable by either party . . . ."), and

---

[5] Importantly, the Court denied plaintiffs' attempt to read into § 215 an implied right to sue for *damages*, reasoning that § 215 fairly implied a right of action to void or rescind a violative contract.

19

reinforces in § 47(b)(2) that illegality gives rise to a right to seek rescission ("To the extent that a contract described in paragraph (1) has been performed, a court may not deny rescission at the instance of any party . . . .").

The legislative history further supports the view that, in the 1980 amendment, Congress intended to confirm the availability of a private action for rescission. When the bill to amend the ICA (H.R. 7554) was reported out of the House Committee on Interstate and Foreign Commerce, the Committee Report stated:

> The Committee wishes to make plain that it expects the courts to imply private rights of action under this legislation, where the plaintiff falls within the class of persons protected by the statutory provision in question. Such a right would be consistent with and further Congress' intent . . . ."

H. Rep. No. 96-1341, 96th Cong., 2d Sess., p. 29 (1980).

The text, contemporary legal context,[6] and legislative history of § 47(b) thus all strongly support our conclusion that parties to contracts that allegedly violate the ICA have a right of action to seek rescission.

---

[6] In *Sandoval*, Justice Scalia's opinion acknowledged that the Court had occasionally relied on contemporary legal context, *see, e.g.*, *Merrill Lynch v. Curran*, 456 U.S. 353 (1982), but suggested that these cases were outliers. *Sandoval*, 532 U.S. at 287–88. Attempting to undermine reliance on contemporary legal context, the Court stated the obvious proposition that "[w]e have never accorded dispositive weight to context shorn of text." *Id.* at 288. The Court further emphasized that "legal context matters only to the extent it clarifies text." *Id.* Here, the text of § 47(b) strongly suggests the creation of a private right of action, and legal context, when viewed in conjunction with the text,

20

We note that the Third Circuit and several lower courts have reached the opposite result. In *Santomenno ex rel. John Hancock Trust v. John Hancock Life Ins. Co.*, 677 F.3d 178 (3d Cir. 2012), the Third Circuit found plaintiffs lacked a private right of action to seek rescission under § 47(b). Plaintiffs in *Santomenno* alleged violations of ICA § 26(f), which makes it unlawful to pay "fees and charges" on certain insurance contracts that exceed what is "reasonable," *id.* at 187, and sought rescission (in addition to monetary damages). The court in *Santomenno* found that plaintiffs did not have a cause of action.

We do not find the reasoning in *Santomenno* persuasive. Strangely, the Third Circuit failed to mention the strongest textual indication of Congressional intent to provide a right of action: the clear language of § 47(b)(2) that "a court may not deny rescission *at the instance of any party* . . . ." 18 U.S.C. § 80a-46(b)(2) (emphasis added). Instead of focusing on the text of the statute, the Third Circuit relied on interpretive canons that are intended to help resolve ambiguity. First, the *Santomenno* court concluded, as did the district court in our case, that the provision of an express right of action in ICA § 36(b) means that Congress intended that § 36(b) provide the

confirms that view. It is thus appropriate, even under the strict standard articulated in *Sandoval*, to consider the aspects of contemporary legal context discussed *supra*.

21

only private right of action. *Santomenno*, 677 F.3d at 186. Second, the *Santomenno* court emphasized that the provision allegedly violated, § 26(f), does not contain "rights-creating language" because it "focus[es] on the [regulated] companies rather than the [plaintiff] investors." *Id.* at 187.

We respectfully disagree. Section 47(b)(2) does contain rights-creating language in providing that a "court may not deny" a party's claim for rescission. Further, while *Santomenno* resorted to canons designed to aid in the interpretation of ambiguous statutory provisions, this statutory text, even though not explicit in declaring the right to a cause of action, unambiguously communicates Congress's intention that parties to illegal contracts have a cause of action for rescission. Moreover, although § 26(f)—like §§ 7 and 8—addresses regulated entities, § 47(b)(2) itself identifies a class of persons who are intended to benefit from the right to seek rescission: parties to illegal contracts. We decline to adopt *Santomenno*'s reasoning.

Adopting slightly different reasoning to arrive at the same result as *Santomenno*, some lower courts have concluded that § 47(b)'s "language is not sufficient to find an implied private right of action" because it "contains a remedy, but not a substantive right." *Smith v. Oppenheimer Funds Distrib., Inc.*,

22

824 F. Supp. 2d 511, 519 (S.D.N.Y. 2011); *see also Smith v. Franklin/Templeton Distribs. Inc.*, No. 09-cv-4775, 2010 WL 2348644, at *7 (N.D. Cal. Jun. 8, 2010) ("By its terms, § 47(b) provides a remedy . . . rather than a distinct cause of action or basis for liability."); *Stegall v. Ladner*, 394 F. Supp. 2d 358, 378 (D. Mass. 2005) (parties concede that "ICA § 47(b) provides a remedy rather than a distinct cause of action or basis of liability"). Under this analysis, as in *Santomenno*, a plaintiff "must assert a predicate violation of a substantive provision of the ICA which itself has a private right of action" in order to bring an action for rescission. *Smith*, 824 F. Supp. 2d at 521. None of these opinions explain what effect § 47(b)(2) has if it does not provide a private right of action. These district court opinions effectively read § 47(b)(2) out of the ICA, purporting to apply *Sandoval* while seeming to ignore its central message that a court's inquiry should focus on Congressional intent as manifested in the text of the statute. *See Sandoval*, 532 U.S. at 286 ("Statutory intent . . . is determinative.").

For the reasons explained above, we find that ICA § 47(b)(2) creates an implied private right of action for a party to a contract that violates the ICA to seek rescission of that violative contract.

II.    Failure to State a Claim under the ICA

Although we conclude that ICA § 47(b)(2) entitles a party to a contract that violates the ICA to seek rescission, Intervenors' claim fails because the contract that they now seek to rescind does not violate the ICA.

Neither the terms of the Indenture (the only contract at issue in this proceeding) nor its performance violate the ICA. The Indenture obligates the Trustee to protect the interests of noteholders by ensuring that the notes are performed lawfully and in accordance with the Indenture's terms, including, as relevant here, by distributing the assets of the trust as provided in the Waterfall Provision upon the occurrence of an Event of Default at the election of the Requisite Noteholders. Indenture §§ 1.1, 5.2(a), 5.4(a)(iv), 11.1. Intervenors do not claim that these provisions of the Indenture violate the ICA.

Intervenors argue that the sale of *unregistered* notes to non-Qualified Purchasers violated the ICA. They may well be correct, and the Intervenors, or some of them, therefore may have had valid claims to rescind the contracts of sale under which non-Qualified Purchasers acquired unregistered notes on the basis that they were contracts whose terms or performance violated the

24

ICA. But those are not the contracts the Intervenors seek to rescind, and the resellers from whom they acquired the notes are not parties to this action. Instead, they seek by this action to block performance of the Indenture, which, as the district court found, compels the Trustee to distribute the assets of the trust.

Intervenors have not identified any provision of the Indenture whose performance would violate the ICA. There is no provision of the Indenture that authorized acquisition of unregistered notes by non-Qualified Purchasers. To the contrary, several of its provisions are designed to ensure that only Qualified Purchasers acquire notes.[7] Furthermore, the relief sought by the Intervenors is not a rescission of the Indenture, so much as a restructuring of its terms to give junior notes a priority status equal to that of senior notes. They do not seek to terminate the rights and obligations established by the Indenture. They seek a selective change of its terms that would effectively convert different tranches of notes, with different priorities of distribution under the Waterfall Provision, into notes of the same class.

---

[7] First, the Indenture expressly prohibits the sale of Notes to non-Qualified Purchasers. Indenture § 2.5(d). Second, all transferees are "deemed to represent at time of transfer that the transferee is . . . a Qualified Purchaser." *Id.* § 2.5(i). Third, if a noteholder is nonetheless found to have been a non-Qualified Purchaser at the time of purchase, then the Co-Issuers can force that noteholder to sell its notes. *Id.* § 2.5(k).

Even if the Intervenors had an entitlement to rescind the Indenture, that would not entitle them to rewrite its terms to alter the relative priorities of the covered classes of notes.

We therefore find that Intervenors have failed to state a claim.

CONCLUSION

We have considered Intervenors' remaining arguments against the district court's ruling and find them to be without merit. The judgment of the district court is AFFIRMED.