(Slip Opinion) OCTOBER TERM, 2025 1

Syllabus

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## FS CREDIT OPPORTUNITIES CORP. ET AL. *v.* SABA CAPITAL MASTER FUND, LTD., ET AL.

### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT

No. 24–345.  Argued December 10, 2025—Decided June 11, 2026

The Investment Company Act (ICA) comprehensively regulates investment companies.  The ICA designates the Securities and Exchange Commission as its primary enforcer and expressly permits shareholders and issuers of securities to enforce two of its provisions.  The question presented in this case is whether Section 47(b) of the ICA impliedly empowers private parties to sue for rescission of any contract that allegedly violates the Act.

Petitioners ("Funds") are investment companies that manage closed-end mutual funds.  These funds are "closed" because each contains a fixed number of shares issued at one time, and the price of each share is determined by trading on the open market.  Respondents Saba Capital Master Fund, Ltd., and Saba Capital Management, L. P., (collectively, Saba) engage in activist investing—a practice that involves identifying low-performing closed-end funds and purchasing a large enough stake to alter the funds' investment strategies.  The Funds are incorporated in Maryland, which has enacted the Maryland Control Share Acquisition Act (MCSAA), and have adopted resolutions opting into MCSAA provisions that limit voting rights for shareholders holding a disproportionate number of shares (like activist investors) unless other shareholders approve.  In June 2023, Saba sued the Funds, alleging that the Funds' resolutions violate the ICA's requirement that every share of stock shall be a voting stock with equal voting rights.  Saba's suit invoked Section 47(b) of the ICA, which provides that "a court may not deny rescission" of contracts that violate the ICA "at the instance of any party" unless the court finds that doing so would be consistent with equity and the ICA's goals.  15 U. S. C. §80a–46(b)(2).

The District Court held that Section 47(b) creates an implied private right of action to sue for contract rescission and granted Saba summary judgment. The Second Circuit summarily affirmed.

*Held*: Section 47(b) of the ICA does not impliedly empower private parties to sue for rescission of contracts that allegedly violate the Act. Pp. 3–10.

(a) Congress, not the Judiciary, decides who may enforce federal law; when Congress creates a private right of action, it usually does so expressly. The Court has rejected the practice of fashioning rights of action, *Alexander* v. *Sandoval*, 532 U. S. 275, 287, because judicially created causes of action are difficult to reconcile with "'the Constitution's separation of legislative and judicial power,'" *Egbert* v. *Boule*, 596 U. S. 482, 491. If a statute does not spell out a right of action, courts examine its text and structure to determine whether it implicitly provides one.

To create a private right, a statute must use "'rights-creating' language" aimed at protecting "'a particular class of persons.'" *Sandoval*, 532 U. S., at 288–289. Language that "focus[es] on the person regulated rather than the individuals protected" does not suffice. *Id.*, at 289. And the existence of an express "remedial schem[e]" elsewhere in the statute may "foreclose a private cause of action to enforce even those statutes that admittedly create substantive private rights." *Id.*, at 290. Pp. 3–4.

(b) Section 47 of the ICA—entitled "[v]alidity of contracts"—provides that any contractual waiver of compliance with the ICA "shall be void," §80a–46(a), and that contracts made in violation of the ICA are generally unenforceable unless specific circumstances are met, §80a–46(b)(1). Relevant here, if such a contract "has been performed, a court may not deny rescission at the instance of any party unless such court finds that under the circumstances the denial of rescission would produce a more equitable result than its grant and would not be inconsistent with the purposes of this subchapter." §80a–46(b)(2).

The phrase "rescission at the instance of any party" does not imply that private parties may sue. Section 47(b) is a "mandate directed to . . . courts," rather than a provision that "confer[s] a right on a specified class of persons." *Thompson* v. *Thompson*, 484 U. S. 174, 183. The key actor is a court, not an individual, §80a–46(b)(2), and it is instructed not to deny the remedy of rescission to parties who request it for performed contracts unless the equities and ICA's goals favor a different result, *ibid.* Section 47(b)'s wording presupposes that parties are already before the court and directs the court's use of its remedial authority; it says nothing about individual rights.

Statutory structure points in the same direction. The Securities and Exchange Commission bears primary responsibility for ensuring

compliance with the ICA and may investigate and bring enforcement actions in response to violations. §80a–41(a). Congress's decision to create a comprehensive agency enforcement scheme supports the conclusion that private parties generally cannot enforce the ICA. *Northwest Airlines, Inc.* v. *Transport Workers*, 451 U. S. 77, 94. Pp. 4–8.

(c) Saba's counterarguments are unpersuasive. The phrase "at the instance of any party" ordinarily means "at the solicitation" or "suggestion of," 7 Oxford English Dictionary 1040, directing a court's remedial power when a party before it is urging rescission; the phrase says nothing about conferring a right to sue in the first place. Saba's reliance on *Transamerica Mortgage Advisors, Inc.* v. *Lewis* (*TAMA*), 444 U. S. 11, which holds that the Investment Advisers Act (IAA) creates an implied right of action based on the phrase "shall be void," §80b–15(b), is unavailing because Congress amended Section 47(b) in 1980, deleting the "shall be void" language on which *TAMA*'s reasoning turns and shifting the focus toward regulating a court's remedial authority. Congress made these changes despite retaining the phrase "shall be void" in the immediately preceding provision, §47(a), and in the IAA itself. Changed language typically indicates changed meaning, and that is true here. Even if *TAMA* applied, it blesses only a "limited private remedy . . . to void an *investment advisers* contract," 444 U. S., at 24 (emphasis added); Saba would wield Section 47(b) to void *any* type of contract that violates the ICA. *TAMA* is thin support for such a sweeping right. Pp. 8–10.

Reversed and remanded.

BARRETT, J., delivered the opinion of the Court, in which ROBERTS, C. J., and THOMAS, ALITO, GORSUCH, and KAVANAUGH, JJ., joined. KAGAN, J., filed a dissenting opinion. JACKSON, J., filed a dissenting opinion, in which SOTOMAYOR, J., joined, and in which KAGAN, J., joined as to Parts I and II.

NOTICE: This opinion is subject to formal revision before publication in the
United States Reports. Readers are requested to notify the Reporter of
Decisions, Supreme Court of the United States, Washington, D. C. 20543,
pio@supremecourt.gov, of any typographical or other formal errors.

# SUPREME COURT OF THE UNITED STATES

───────────

No. 24–345

───────────

## FS CREDIT OPPORTUNITIES CORP., ET AL., PETITIONERS *v.* SABA CAPITAL MASTER FUND, LTD., ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE SECOND CIRCUIT

[June 11, 2026]

JUSTICE BARRETT delivered the opinion of the Court.

Congress, not the Judiciary, decides who may enforce the
law. The Investment Company Act designates the Securi-
ties and Exchange Commission as its primary enforcer and
expressly permits shareholders and issuers of securities to
enforce two of its provisions. We must decide whether an-
other provision of the Act impliedly empowers private par-
ties to sue for rescission of any contract that allegedly vio-
lates the Act. The answer is no.

I

The Investment Company Act (ICA) comprehensively
regulates investment companies. Petitioners, whom we
will call the "Funds," are investment companies that man-
age closed-end mutual funds. These funds are called
"closed" because they contain a fixed number of shares is-
sued at one time. After shares are issued, capital does not
regularly flow into the funds when investors buy shares,
nor does it flow out when they sell. Instead, shares trade
on the open market, which determines their price. Even
though the net-asset value of the holdings may be lower due

to market fluctuations, long-term investors (like individuals saving for retirement) often favor closed-end funds.

Respondents Saba Capital Master Fund, Ltd., and Saba Capital Management, L. P., whom we will call "Saba," manage open-end mutual funds. Unlike their closed-end counterparts, open-end funds continually issue new shares to investors. These funds do not trade on the market and their shares are priced daily based on the net-asset value of the underlying holdings. Because capital continually flows into and out of these funds as trading occurs, they are highly liquid. Saba's investment strategy includes identifying low-performing closed-end funds and purchasing a large enough stake to change the funds' behavior. Brief for Respondents 17–18. Known as activist investing, this practice allows Saba to alter closed-end funds' investment strategies to make short-term profit or to convert them into open-end funds. Brief for Petitioners 11; *Saba Capital CEF Opportunities 1, Ltd.* v. *Nuveen Floating Rate Income Fund*, 88 F. 4th 103, 108 (CA2 2023).

To avoid activist-investor takeovers, closed-end funds generally incorporate in jurisdictions with laws that favor them. The Funds are incorporated in Maryland, which has enacted the Maryland Control Share Acquisition Act (MCSAA). The MCSAA limits voting rights for shareholders holding a disproportionate number of shares (like activist investors) unless other shareholders approve. See Md. Corp. & Assns. Code Ann. §3–702(a)(1) (2026). In this way, it prevents rapid shifts in fund control. The Funds have adopted resolutions opting into the MCSAA.

In June 2023, Saba sued the Funds over those resolutions. Saba alleged that they violate the ICA's requirement that "every share of stock . . . shall be a voting stock and have equal voting rights with every other outstanding stock." 15 U. S. C. §80a–18(i). For a right of action, Saba invoked Section 47(b) of the ICA. That section provides that "a court may not deny rescission" of contracts that violate

the ICA "at the instance of any party" unless the court finds that doing so would be consistent with equity and the ICA's goals. §80a–46(b)(2).

The District Court, following the Second Circuit's decision in *Oxford University Bank* v. *Lansuppe Feeder, LLC*, 933 F. 3d 99 (2019), held that Section 47(b) creates an implied private right of action to sue for contract rescission and granted Saba summary judgment. The Second Circuit summarily affirmed. We granted certiorari to resolve a circuit split over whether Section 47(b) contains an implied private right of action.[1]  606 U. S. 930 (2025).

## II

Congress determines who may sue to enforce federal law. *Touche Ross & Co.* v. *Redington*, 442 U. S. 560, 579 (1979); *Alexander* v. *Sandoval*, 532 U. S. 275, 286 (2001). When Congress creates a private right of action, it usually does so expressly. For example, "[a] person whose religious exercise has been burdened in violation of [the Religious Freedom Restoration Act] may assert that violation as a claim or defense in a judicial proceeding." 42 U. S. C. §2000bb–1(c). A "person aggrieved" by discrimination may "institut[e]" a "civil action for preventative relief." §2000a–3(a). And so on.

Private litigants sometimes sue to enforce statutes that lack comparable language. At one point in time, the Court stood ready to let them; it reasoned that courts should "be alert to provide such remedies as are necessary to make effective the congressional purpose" underlying a statute. *J. I. Case Co.* v. *Borak*, 377 U. S. 426, 433 (1964). But we have since rejected the practice of fashioning rights of

_____

[1] Compare *Oxford Univ. Bank*, 933 F. 3d, at 105, with *Santomenno ex rel. John Hancock Trust* v. *John Hancock Life Ins. Co. (U. S. A.)*, 677 F. 3d 178, 186–187 (CA3 2012); *Steinberg* v. *Janus Capital Mgmt., LLC*, 457 Fed. Appx. 261, 267 (CA4 2011) (*per curiam*); *UFCW Local 1500 Pension Fund* v. *Mayer*, 895 F. 3d 695, 699–701 (CA9 2018).

action as we see fit. *Central Bank of Denver, N. A.* v. *First Interstate Bank of Denver, N. A.*, 511 U. S. 164, 170 (1994); *Sandoval*, 532 U. S., at 287. Home-grown causes of action are difficult to reconcile with "the Constitution's separation of legislative and judicial power." *Egbert* v. *Boule*, 596 U. S. 482, 491 (2022) (internal quotation marks omitted). Rather than augmenting statutes, we interpret them. If a statute does not spell out a right of action, we examine the statute's text and structure to determine whether it implicitly provides one.

To create a private right, a statute must use "rights-creating language" aimed at protecting "a particular class of persons." *Sandoval*, 532 U. S., at 288–289 (internal quotation marks omitted); *Gonzaga Univ.* v. *Doe*, 536 U. S. 273, 284 (2002) (statutes create private rights when they are "'phrased in terms of the persons benefited'"). Language that "focus[es] on the person regulated rather than the individuals protected" does not fit the bill. *Sandoval*, 532 U. S., at 289. And language establishing an express "remedial schem[e]" elsewhere in the statute may "foreclose a private cause of action to enforce even those statutes that admittedly create substantive private rights." *Id.*, at 290; *Middlesex County Sewerage Authority* v. *National Sea Clammers Assn.*, 453 U. S. 1, 13–14 (1981) (existence of "elaborate enforcement provisions" forecloses the "implication [of] additional judicial remedies"). So we also examine whether Congress has provided other mechanisms for enforcing the provision at issue. *Northwest Airlines, Inc.* v. *Transport Workers*, 451 U. S. 77, 93–94 (1981).

With this framework in mind, we turn to the ICA. Section 47—entitled "[v]alidity of contracts"—contains two parts. The first provides that any contractual waiver of compliance with the ICA "shall be void." 15 U. S. C. §80a–46(a). The second provides that contracts made in violation of the ICA are "unenforceable by either party . . . unless a court finds that under the circumstances enforcement

would produce a more equitable result . . . and would not be inconsistent with the purposes of this subchapter." §80a–46(b)(1). And if such a contract "has been performed, a court may not deny rescission at the instance of any party unless such court finds that under the circumstances the denial of rescission would produce a more equitable result than its grant and would not be inconsistent with the purposes of this subchapter." §80a–46(b)(2). The question is whether the phrase "rescission at the instance of any party" implies that private parties may sue. It does not.

Section 47(b) is a "mandate directed to . . . courts," rather than a provision that "confer[s] a right on a specified class of persons." *Thompson* v. *Thompson*, 484 U. S. 174, 183 (1988); cf. *Sandoval*, 532 U. S., at 289 (provision "'phrased as a directive to federal agencies'" does not create a private right or remedy). The key actor is "a court," not an individual. §80a–46(b)(2). And a court is told that it "may not deny" the remedy of rescission to parties who request it for performed contracts unless the equities and statutory purposes favor a different result. *Ibid.* Section 47(b)'s wording thus presupposes that parties are already before the court and directs the court's use of its remedial authority. It says not a word about individual rights.

It bears emphasis that contract law treats rescission as a remedy, not a cause of action. See H. Black, Rescission of Contracts and Cancellation of Written Instruments §1 (1916) (Black). Suits seeking rescission end up before courts in various ways. A party to a contract may bring an action under state law—say, for breach of contract—and ask the court to undo the contract. See 26 R. Lord, Williston on Contracts §68:22 (4th ed. 2019). Or she may seek rescission when raising an affirmative defense such as fraud, mistake, or duress in a breach-of-contract suit. See 27 *id.*, §69:48 (2020); Brief for United States as *Amicus Curiae* 19. Or a nonparty, such as a shareholder, may seek rescission alleging that corporate officers violated their fiduciary

duties. §80a–35(b). Regardless, other sources of law typically supply the right of action in suits requesting rescission.[2]

Section 47(b)'s function underscores the provision's focus on a court's remedial power. The common law makes it difficult to obtain rescission if a contract has been performed. If a contract formed in violation of a statute "has been fully executed on the part of the plaintiff," then neither "a court of law nor a court of equity will assist the plaintiff to recover back the property conveyed or money paid under the contract." *St. Louis, V. & T. H. R. Co.* v. *Terre Haute & Indianapolis R. Co.*, 145 U. S. 393, 407–408 (1892); Black §313; see 15 W. Jaeger, Williston on Contracts §1787 (3d ed. 1972). In that circumstance, the common law denies rescission and leaves the parties "where their own acts have placed them." Black §313; see also *id.*, §318 (discussing rescission in the context of contracts formed in violation of statutes); Restatement (First) of Contracts §598 (1932) (similar). Section 47(b) deviates from that common-law rule by instructing that courts "may not deny rescission" on the basis that a contract has been performed. By overriding the common-law default, it unlocks remedies that would otherwise be unavailable. It does not create a cause of action.

Statutory structure points in the same direction. As the principal dissent concedes, *post*, at 10 (opinion of JACKSON, J.) (hereinafter the dissent), the Securities and Exchange Commission bears primary responsibility for ensuring

---

[2] Insisting that rescission signals a cause of action, the dissent quotes from Black's treatise, which states that "'a party . . . *may invoke the aid of a court of equity* and obtain a decree for . . . rescission.'" *Post*, at 9 (opinion of JACKSON, J.) (quoting Black §1). Elsewhere, however, the treatise explains that a party may obtain equitable rescission only if "he is able to show the existence of some well-recognized title to equitable relief, such as fraud, mistake, or duress." *Id.*, §14. Consistent with our view, then, the treatise frames rescission as a remedy that may be granted to a party with an underlying claim in equity.

compliance with the ICA. It may investigate and bring enforcement actions in response to violations of "any provision of [the ICA] or of any rule, regulation, or order" issued under the Act. §80a–41(a). It may also "bring an action in . . . court" for injunctive relief or civil monetary penalties. §§80a–41(d), (e). Congress's decision to create a comprehensive agency enforcement scheme supports the conclusion that private parties generally cannot enforce the ICA. *Northwest Airlines, Inc.*, 451 U. S., at 94; see *Karahalios* v. *Federal Employees*, 489 U. S. 527, 533 (1989). Put differently, "[t]he express provision of one method of enforc[ement] . . . suggests that Congress intended to preclude others." *Sandoval*, 532 U. S., at 290 (collecting cases); *Gonzaga Univ.*, 536 U. S., at 289 (reasoning that because the Secretary of Education is authorized to enforce the Family Educational Rights and Privacy Act of 1974, it does not create privately enforceable rights).

While the Securities and Exchange Commission is the ICA's main enforcer, the Act also expressly authorizes two private rights of action. Since 1970, the ICA has allowed security holders to sue investment advisers for breaches of fiduciary duty. §80a–35(b) ("An action may be brought . . . by a security holder of [a] registered investment company on behalf of such company" for breach of fiduciary duty against certain members of the company). This provision also details how the right of action should operate: It assigns burdens of proof, caps damages, and specifies a forum. *Ibid.* The ICA also incorporates an express right of action from the Securities Exchange Act, which allows an issuer of securities to recover certain short-term profits realized by a regulated individual. §80a–29(h) (incorporating §78p(b), which permits "[s]uit to recover" such profits). These provisions demonstrate that "when Congress wished to provide a private . . . remedy" to enforce the ICA, "it knew how to do so and did so expressly." *Touche Ross & Co.*, 442 U. S., at 572. We have traditionally been reluctant to conclude

that Congress implicitly created a private remedy in one provision when it explicitly did so in another. See *Transamerica Mortgage Advisors, Inc.* v. *Lewis*, 444 U. S. 11, 20, and n. 10 (1979) (*TAMA*) (reasoning that because one provision of the ICA authorizes private lawsuits for damages, we should not imply a private right of action for that relief elsewhere). So too here.[3]

In sum, nothing in the text or structure of the ICA indicates that Congress authorized private parties to enforce virtually every provision in the statute. For a cause of action to exist, we would have to create it. And having "sworn off the habit" of implying private rights of action, "we will not accept [Saba's] invitation to have one last drink." *Sandoval*, 532 U. S., at 287.

## III

Saba's counterarguments, while not without force, are ultimately unpersuasive. As for text, it points out that Section 47(b) also includes the phrase "at the instance of any party." Brief for Respondents 23–26. According to Saba, this language displays Congress's intent to create a private right of action. But the ordinary meaning of "*at the instance of* (a person)" is "at the solicitation" or "suggestion of." 7 Oxford English Dictionary 1040 (2d ed. 1989). And "instance," when used as verb, means "[t]o urge." *Ibid.*; see also Webster's New International Dictionary 1287 (2d ed. 1954) ("[t]o urge; importune"). The legal meaning of "instance" is the same. See, *e.g.*, Black's Law Dictionary 947 (12th ed. 2024) ("[u]rgent solicitation or insistence"); 2 Bouvier's Law Dictionary 1604 (8th ed. 1914) ("urging"). So the phrase "a court may not deny rescission at the instance of any party" is most naturally read to direct a court's

_____

[3] The dissent claims that the ICA's express causes of action authorize "damages, not rescission." *Post*, at 11 (emphasis deleted). But §80a–35(b)(3) references both "damages or other relief" and nowhere states that rescission is unavailable.

remedial power when a party before it is urging rescission. §80a–46(b)(2). It says nothing about conferring a right to sue in the first place.

Saba puts most of its chips on *TAMA*, which holds that Section 215 of a different statute—the Investment Advisers Act (IAA)—creates an implied right of action. 444 U. S., at 18. Section 215 provides that contracts whose formation or performance violates the IAA "shall be void." 15 U. S. C. §80b–15(b). *TAMA* reasons that "[b]y declaring certain contracts void, §215 by its terms necessarily contemplates that the issue of voidness under its criteria may be litigated somewhere." 444 U. S., at 18. According to *TAMA*, someone "with the power to void a contract ordinarily may resort to a court to have the contract rescinded and to obtain restitution of consideration paid." *Ibid.*; see *id.*, at 19 (Congress's use of "void" indicates that "customary legal incidents of voidness would follow, including the availability of a suit"). Thus, *TAMA* holds that Section 215 of the IAA contains an implied private right of action to "void [an] investment advisers contract." *Id.*, at 19, 24.

As originally enacted, Section 47(b) of the ICA mirrored Section 215 of the IAA. 54 Stat. 846 (every contract made or performed in violation of the ICA "shall be void"). So under *TAMA*, Saba says, Section 47(b) likewise contains a cause of action. Case closed.

If this were 1979, the year that *TAMA* was decided, then Saba would have a point. But as even the dissent grudgingly admits, *post*, at 7–8, something important happened in 1980: Congress amended the ICA and entirely reworked Section 47(b). Relevant here, it added references to the key actor—"'a court.'" 94 Stat. 2277. And Congress deleted the language that contracts formed in violation of the ICA "shall be void" and replaced it with two distinct phrases. The first states that contracts violating the ICA are "'unenforceable by either party,'" and the second provides that if

10    FS CREDIT OPPORTUNITIES CORP. *v.* SABA CAPITAL
MASTER FUND, LTD.

Opinion of the Court

one of those contracts has been performed, "a court may not
deny rescission." *Ibid*.[4]

Saba tries to use the amendment to its advantage: It ar-
gues that Congress simply made the right of action *TAMA*
recognizes "explicit" by inserting the term "rescission."
Brief for Respondents 33–34. In other words, the edit was
clarifying rather than substantive. But changed language
typically indicates changed meaning. A. Scalia & B. Gar-
ner, Reading Law: The Interpretation of Legal Texts 256
(2012). And the changes here are significant. Most im-
portantly, Congress deleted the "shall be void" language on
which *TAMA*'s reasoning turns and shifted the focus to reg-
ulating a court's remedial authority. 94 Stat. 2277. Con-
gress made these changes despite retaining the phrase
"shall be void" in the immediately preceding provision, Sec-
tion 47(a). Likewise, it did not remove the "shall be void"
language in the IAA, even though it made other changes to
that statute. *Id*., at 2289–2291. So what Saba portrays as
a clarifying edit actually *distinguishes* Section 47(b) of the
ICA from Section 215 of the IAA. The 1980 amendments
were a renovation, not a new coat of paint.

Given the textual differences between Section 47(b) and
Section 215, *TAMA* does not get Saba far. And to be clear,
Saba would take *TAMA* far indeed. *TAMA* blesses only a
"limited private remedy . . . to void an *investment advisers*
contract." 444 U. S., at 24 (emphasis added). Saba finds
something much larger hiding in congressional silence: It
would wield Section 47(b) to void *any* type of contract that
violates the ICA. *TAMA* is thin support for such a sweeping
right.

————————
[4] The dissent faults us for disregarding the statutory and legislative
history of Section 47(b). *Post*, at 1, 13–22. As for the latter: guilty as
charged. But the accusation is perplexing with respect to the former,
because statutory history is precisely what we consider here.

## IV

In the dissent's view, the key to this case lies in two Committee Reports expressing Congress's "'wish'" that courts liberally imply private rights of action. *Post*, at 1. The dissent repeatedly faults us for failing to consider these Reports, and broadly attempts to defend the use of legislative history in interpreting statutes. *Post*, at 1, 11–22. Its efforts do not just fail—they backfire.

Notably, the dissent does not use the Committee Reports to clarify the meaning of Section 47(b). For instance, the dissent does not consult the Committee Reports to see how their authors used the words on which this case turns: "rescission at the instance of any party." Nor does it try to identify the circumstances that prompted Congress to retool Section 47(b). Instead, the dissent uses the Reports on a mission impossible: divining how Congress would have wanted courts to resolve the question presented in this case. Its theory depends on the fictional premise that hundreds of legislators (not to mention the President) shared a unified private view of how the statute should apply in a contested circumstance. See F. Easterbrook, Statutes' Domains, 50 U. Chi. L. Rev. 533, 547−548 (1983); K. Shepsle, Congress Is a "They," Not an "It": Legislative Intent as Oxymoron, 12 Int'l Rev. L. & Econ. 239, 241–244, 249 (1992).[5] Worse, it violates the fundamental precept that "[w]e are governed by laws, not by the intentions of legislators." *Conroy* v. *Aniskoff*, 507 U. S. 511, 519 (1993) (Scalia, J., concurring in judgment).

––––––––––

[5] The dissent responds that "it is hard to take th[is] criticism seriously" because *all* statutory interpretation seeks to discern Congress's intent. *Post*, at 19. But rather than trying to unearth Congress's "actual intent," *post*, at 1, courts look for "'objectified' intent"—the intent that a reasonable person would gather from the text of the law. A. Scalia, A Matter of Interpretation: Federal Courts and the Law 17 (1997). Put differently: The judicial task is to read words, not minds.

Even assuming that Congress's subjective intent were knowable and controlling, the dissent fails to deliver. Far from demonstrating the value of legislative history, the dissent models its misuse.

The classic criticism of using legislative history is that it is "the equivalent of entering a crowded cocktail party and looking over the heads of the guests for one's friends." *Ibid.* True to form, the dissent navigates around unwelcome guests. The most relevant portions of the Reports are those addressing Section 47(b)—which is, after all, the provision we are interpreting. But the dissent ignores these sections altogether, presumably because they undercut its argument. In its discussion of Section 47(b), the House Report nowhere mentions a private right of action. Instead, it states that the 1980 amendment "embodies a general revision . . . and is designed to provide clearer statutory guidance in interpreting that equitable rescission *remedy*." H. R. Rep. No. 96–1341, p. 27 (1980) (H. R. Rep.) (emphasis added). The Senate Report contains the same language. S. Rep. No. 96–958, p. 10 (1980) (S. Rep.). Rather than treating the amended provision as a right of action, both sections confirm the obvious point that rescission is a remedy. And their references to "clearer statutory guidance in interpreting" Section 47(b) support treating the provision as a directive to courts—the typical interpreters of statutes—about how to handle cases already before them.

While ignoring these sections, the dissent takes creative license with others. It confidently assures the reader that there is "legislative history containing an explicit statement from Congress imploring 'courts to imply private rights of action under' the amended Section 47(b)." *Post*, at 13. There is no such statement. The paragraph that the dissent cites in the Senate Report, *post*, at 6, 12, 13, speaks of implying causes of action in the "federal securities laws" generally, not the ICA specifically. S. Rep., at 14. The cited House Report pages, *post*, at 6, 12, 13, are similar. H. R.

Rep., at 28–29. In fairness to the dissent, these paragraphs reference the ICA in passing—but not Section 47(b). The Senate Report says that courts should imply causes of action "to the same extent that such causes of action are implied under the Investment Company Act." S. Rep., at 14. And the House Report expresses the Committee's expectation that "[i]n appropriate instances, for example, breaches of fiduciary duty involving personal misconduct should be remedied under *Section 36(a)* of the Investment Company Act." H. R. Rep., at 29 (emphasis added). These Committee Reports do not, as the dissent claims, "unequivocally expres[s]" Congress's desire that courts imply causes of action under Section 47(b) of the ICA. *Post*, at 1; see also *post*, at 12 (claiming that "a clearer expression of legislative intent" has "seldom [been] seen").

At most, the dissent's citations show that members of the House and Senate Committees wanted courts to imply causes of action in some unidentified provisions of the securities laws. But even if committee members would have put Section 47(b) on that list, what should we make of it? The House Report notes disapprovingly that "in recent years, the Supreme Court [has] turned its focus toward a strict construction of statutory language and expressed intent." H. R. Rep., at 28. It then bemoans the Court's unwillingness to imply causes of action and criticizes the Court for declining to imply a damages remedy in *TAMA*. H. R. Rep., at 28–29, n. 6. One wonders: If the House Committee wanted to authorize private remedies and knew that the Court would be reluctant to imply them, why did it not make them express? Were members of the House Committee uncertain whether express causes of action would win approval from a majority of the House, a majority of the Senate, and the President? Cf. J. Manning, The Absurdity Doctrine, 116 Harv. L. Rev. 2387, 2417 (2003) (Manning); A. Gluck & L. Bressman, Statutory Interpretation From the Inside—An Empirical Study of Congressional Drafting,

14    FS CREDIT OPPORTUNITIES CORP. *v.* SABA CAPITAL
MASTER FUND, LTD.

Opinion of the Court

Delegation, and the Canons: Pt. I, 65 Stan. L. Rev. 901, 973–974 (2013).  Did they worry that authorizing private remedies might undo compromises that enabled the bill to cross the finish line?  Manning 2411–2412, 2417.  There is no way to know.  Congress expresses itself as a body through the text it enacts; the views of the 42-member House Committee on Interstate and Foreign Commerce and of the 15-member Senate Committee on Banking, Housing, and Urban Affairs are not the law.  See Congressional Directory, 96th Cong., 1st Sess. 301 (1979); S. Rep., at II.

At bottom, the dissent hopes to revive that old-time devotion to legislative history.  See, *e.g.*, *Church of Holy Trinity* v. *United States*, 143 U. S. 457, 464–465 (1892).  Instead of winning converts, however, the dissent illustrates why statutory interpretation must focus on the text—or, to borrow from Justice Robert Jackson, why interpretation must be driven by "analysis of the statute" rather than "psychoanalysis of Congress."  *United States* v. *Public Util. Comm'n of Cal.*, 345 U. S. 295, 319 (1953) (concurring opinion).

*    *    *

The judgment of the Court of Appeals is reversed, and the case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*

# SUPREME COURT OF THE UNITED STATES

No. 24–345

FS CREDIT OPPORTUNITIES CORP., ET AL., PETITIONERS *v.* SABA CAPITAL MASTER FUND, LTD., ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT

[June 11, 2026]

JUSTICE KAGAN, dissenting.

My views about the proper use of legislative history in statutory interpretation fall someplace in between the majority's and the principal dissent's. The one-sentence version is: Reliance on legislative history may be appropriate when statutory text in context remains, after careful review, stubbornly ambiguous. I do not find Section 47(b) to exhibit such a lack of clarity. For the reasons JUSTICE JACKSON gives in Parts I and II of her dissenting opinion, the text, structure, and statutory history of Section 47(b) support recognition of a private right of action. I therefore gladly join those parts of JUSTICE JACKSON's dissent, while abstaining from the opinions' further debate about the meaning of the House and Senate Reports.

# SUPREME COURT OF THE UNITED STATES

———————

No. 24–345

———————

## FS CREDIT OPPORTUNITIES CORP., ET AL., PETITIONERS *v.* SABA CAPITAL MASTER FUND, LTD., ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE SECOND CIRCUIT

[June 11, 2026]

JUSTICE JACKSON, with whom JUSTICE SOTOMAYOR joins, and with whom JUSTICE KAGAN joins as to Parts I and II, dissenting.

I agree with the Court that "Congress, not the Judiciary, decides who may enforce the law." *Ante*, at 1. It is for that very reason that I think courts should consult all reliable indicia of Congress's intent when interpreting its statutes. Had the Court done so here, it would have acknowledged that Congress amended Section 47(b) of the Investment Company Act in reliance on a prior decision of ours that had interpreted the original text to contain an implied private right of action for rescission. It would also have wrestled with legislative Committee Reports that unequivocally expressed Congress's "wish" that the statute continue to be interpreted to allow private suits, notwithstanding this Court's increasing penchant for refusing to recognize implied rights of action.

The majority today misreads the text of Section 47(b). It also deftly sidesteps compelling evidence of Congress's actual intent and opts instead to draw inferences about Congress's objectives. In so doing, the majority assumes for itself the prerogative to foreclose contract-rescission suits that Congress intended to authorize. Because the Court's

proper role is to give effect to the will of the people, not supplant it, I respectfully dissent.

## I

## A

In 1940, Congress made a post-Great Depression push to "eliminate certain abuses in the securities industry." *SEC* v. *Capital Gains Research Bureau, Inc.*, 375 U. S. 180, 186 (1963). As part of this effort, it simultaneously enacted the Investment Company Act (ICA) and the Investment Advisers Act (IAA).

As relevant to the ICA, Congress found that "the national public interest and the interest of investors are adversely affected" when, among other things, "investment companies issue securities containing inequitable or discriminatory provisions." 15 U. S. C. §80a–1(b)(3). Accordingly, Congress included a rule of construction that the ICA "shall be interpreted" to "mitigate and, so far as is feasible, to eliminate the conditions enumerated in [the statute] which adversely affect the national public interest and the interest of investors." §80a–1(b). One of those conditions was that "every share of stock hereafter issued by a registered management company . . . shall be a voting stock and have equal voting rights with every other outstanding voting stock." §80a–18(i).[1]

Consistent with Congress's anti-abuse purpose, the ICA and the IAA contained a stick: "Every contract made in violation of any provision of [the ICA or the IAA], and every contract heretofore or hereafter made, the performance of which involves the violation of . . . any provision of" the statutes "*shall be void.*" §47(b), 54 Stat. 846 (ICA) (emphasis added); §215(b), *id.*, at 856 (IAA).

These provisions mirrored Section 29(b) of the Securities Exchange Act, which Congress had enacted just six years

------

[1] Respondents' claim for rescission is premised on the allegation that petitioners violated this condition.

before. See 48 Stat. 903. Section 29(b), in turn, "drew from" States' "enactment of their own 'blue-sky' statutes," which were widely understood by both judges and scholars to create a private right to rescission. *Aaron* v. *SEC*, 446 U. S. 680, 711 (1980) (Blackmun, J., concurring in part and dissenting in part); see Brief for Securities-Law Scholars et al. as *Amici Curiae* 6–8 (collecting scholarship and state-court cases). Thus, in a 1970 case called *Mills* v. *Electric Auto-Lite Co.*, 396 U. S. 375, the Court thought it "eminently sensible" that the "lower federal courts ha[d] read §29(b), which has counterparts in . . . the [ICA] and the [IAA]," as giving "the victim" the "right to rescind" the contract. *Id.*, at 387–388.

We confirmed that view nine years later in another case called *Transamerica Mortgage Advisors, Inc.* v. *Lewis*, 444 U. S. 11 (1979) (*TAMA*). *TAMA* held that Section 215 of the IAA "fairly implies a right to specific and limited relief in a federal court"—namely, a private legal action to seek rescission of an unlawful contract. *Id.*, at 18. Declining to place "emphasis upon the desirability of implying private rights of action in order to provide remedies thought to effectuate the purposes of a given statute," *TAMA* focused exclusively on "whether Congress intended to create the private remedy asserted." *Id.*, at 15–16 (citing, *inter alia, Touche Ross & Co.* v. *Redington*, 442 U. S. 560, 568 (1979)).

With respect to the "shall be void" language in Section 215, the *TAMA* Court concluded that the text of the statute was clear. See 444 U. S., at 18–19. First, we explained, the "language of" Section 215, along with that of a related provision that "broadly proscribe[d] fraudulent practices by investment advisers," ran "to [the] benefit [of] the clients of investment advisers, and . . . the parties to advisory contracts." *Id.*, at 16–17. Second, "[b]y declaring certain contracts void, §215 by its terms necessarily contemplate[d] that the issue of voidness under its criteria may be litigated somewhere." *Id.*, at 18. To be sure, Section 215 voidness

might be "raised defensively." *Ibid.* "But the legal conse-
quences of voidness are typically not so limited." *Ibid.* As
the Court had recognized in *Mills*, and as federal and state
courts have acknowledged for years, "[a] person with the
power to void a contract ordinarily may resort to a court to
have the contract rescinded." *TAMA*, 444 U. S., at 18; see
*id.*, at 19 (citing *Mills*, 396 U. S., at 388). So, we reasoned,
"when Congress declared in §215 that certain contracts are
void, it intended that the customary legal incidents of void-
ness would follow, including the availability of a suit for re-
scission." 444 U. S., at 19.

Notably, all nine Justices agreed with the part of *TAMA*
that held a private right of action for rescission was implicit
in Section 215.[2] Four Justices disagreed with a later part
of the opinion, which held that a different section of the IAA
did not imply a "private right of action for a *monetary
award*." *Id.*, at 20 (emphasis added); see *id.*, at 29–33
(White, J., dissenting). In reaching that conclusion, the
majority observed that Congress had chosen to "*expressly*
authoriz[e] private suits for damages in prescribed
circumstances" in "each of the securities laws that preceded
the [IAA]," including the ICA. *Id.*, at 20 (emphasis added).
"'Obviously, then, when Congress wished to provide a
private damages remedy, it knew how to do so and did so
expressly.'" *Id.*, at 21 (quoting *Touche Ross*, 442 U. S., at
572). The fact that it did not make any such express
statement in the IAA, we held, showed "that Congress did
not intend to authorize a cause of action for anything
beyond limited equitable relief." *TAMA*, 444 U. S., at 22.

Our decision in *TAMA* necessarily controlled the question
whether Section 47(b) of the ICA implied a private right of

---

[2] Even Justice Powell, whose well-known criticisms of the Court's
implied-rights jurisprudence would help shape the Court's more recent
decisions in this area of law, viewed the rescission-focused part of *TAMA*
"as compatible with [his] dissent in *Cannon* v. *University of Chicago*, 441
U. S. 677, 730 (1979)." *TAMA*, 444 U. S., at 25 (concurring opinion).

action for rescission, since Section 47(b) was identical to—and enacted simultaneously with—Section 215 of the IAA. See *Smith* v. *City of Jackson*, 544 U. S. 228, 233 (2005) (opinion of Stevens, J.) ("[W]hen Congress uses the same language in two statutes having similar purposes, particularly when one is enacted shortly after the other, it is appropriate to presume that Congress intended that text to have the same meaning in both statutes").

So, as of 1979, it was indisputable that Section 47(b) of the ICA contained a private right of action for rescission—on that, even the majority agrees. See *ante*, at 9.[3]

B

Today's dispute has arisen because, one year after *TAMA*, Congress amended Section 47(b) and revised its "shall be void" language. The new Section 47(b) reads:

"(1) A contract that is made, or whose performance involves, a violation of [the ICA], or of any rule, regulation, or order thereunder, is unenforceable by either party . . . unless a court finds that under the circumstances enforcement would produce a more equitable result than nonenforcement and would not be inconsistent with the purposes of [the ICA].

"(2) To the extent that a contract described in paragraph (1) has been performed, a court may not deny rescission at the instance of any party unless such court finds that under the circumstances the denial of rescission would produce a more equitable result than its

―――――――

[3] The majority does equivocate, though, offering as a throwaway that "*TAMA* does not get Saba far" because it "blesses only a 'limited private remedy . . . to void an *investment advisers* contract.'" *Ante*, at 10 (quoting *TAMA*, 444 U. S., at 24). This distinction appears nowhere in the parties' briefs and does not amount to anything. *TAMA* referred to "investment advisers contract[s]" because the case was about the IAA—short for the "*Investment Advisers* Act"—not because there is something special about the contracts of investment advisers as compared to other investment-related contracts.

grant and would not be inconsistent with the purposes of [the ICA]." 15 U. S. C. §80a–46(b).

Unlike in the original version of the statute, the amended Section 47(b)'s two paragraphs pertain to two different scenarios. In the first, the contract at issue has not yet been performed, but the ICA violation renders it "unenforceable by either party." §80a–46(b)(1). In the second (the one relevant here), the problematic contract "has been performed," but "a court may not deny rescission at the instance of any party" unless the equities counsel otherwise. §80a–46(b)(2).

In their respective Reports, the relevant House and Senate Committees expressed "that private rights of action under [the amendments] should be implied to and in its enforcement to the same extent that such causes of action [were] implied under the [original statute]." S. Rep. No. 96–958, p. 14 (1980); see also H. R. Rep. No. 96–1341, p. 29 (1980). Both Committees explained that, "[w]ith a relatively small staff charged with administrative responsibility for policing potentially unlawful securities-related activities, the [Securities and Exchange] Commission [could not] be expected to bring actions against even a large portion of those engaged in schemes, devices and activities that are prohibited by federal law." S. Rep. No. 96–958, at 14; see also H. R. Rep. No. 96–1341, at 28. Private actions would fill that gap.

## II

In determining whether statutes create private rights of action, as in interpreting statutes generally, legal context can serve a useful purpose in clarifying the statutory text. See *Alexander* v. *Sandoval*, 532 U. S. 275, 288 (2001). "Statutory history," in particular, "is an important part of [the] context" that supports a statute's text—"the water in which [the words] swim." *United States* v. *Hansen*, 599 U. S. 762, 775 (2023). And we generally "presum[e]"

Congress is aware of our prior "judicial interpretation of a statute" when it takes up the pen to reenact or amend it. *Lorillard* v. *Pons*, 434 U. S. 575, 580–581 (1978).

Therefore, while the majority proceeds as if Section 47(b) arrived in the U. S. Code vacuum-sealed and devoid of any background, the correct interpretation of Section 47(b) must account for *TAMA*.[4] Viewed in context, the critical question is whether Congress intended to reject *TAMA*'s holding when it undertook to amend the statute after that case was decided.

To be sure, the fact that Congress changed the statute provides an opening for the argument that Section 47(b) is different now. *Ante*, at 9–10. But to its credit, for all its emphasis on the "substantive" nature of Congress's "renovation[s]," the majority never goes so far as to say that Congress rejected *TAMA*. *Ante*, at 9–10. Nothing in the text or structure of the amended Section 47(b) shows that Congress did so.

A

Start with the text. Section 47(b) was not crafted on a blank slate—Congress built on its prior work and this Court's relevant interpretations. Read in context, the text of Section 47(b) confirms that Congress expected the courts to keep with *TAMA*.

The majority is quick to emphasize that Congress removed key language from Section 47(b)—*i.e.*, the words "shall be void"—and infers from this that the amendment was meant to excise the private right of action *TAMA* had recognized. See *ante*, at 9–10. But our analysis in *TAMA*

_____

[4] The majority views this observation as an "accusation" and calls it "perplexing" because the Court's opinion does address *TAMA*. *Ante*, at 10, n. 4. But the majority's consideration of statutory history is clearly an afterthought; *TAMA* plays no role in its affirmative interpretation of Section 47(b) and is discussed only in the course of responding to Saba's counterarguments, *after* the majority's own statutory analysis has concluded. See *ante*, at 9–10.

did not rely exclusively on those specific words. Moreover, the majority's focus on what Congress *took out* of the statute diverts attention from what matters just as much (if not more) for the interpretive exercise here: the language Congress *added*. The words Congress inserted into Section 47(b)—"a court may not deny rescission at the instance of any party"—more than make up for the ones that it removed.

Most notably, Congress inserted "rescission." Of all the words that it could have chosen, Congress went with the very one that had appeared the year before in the *TAMA* opinion. See *TAMA*, 444 U. S., at 19. Congress was armed with *TAMA* at the time it amended the statute, and it quite obviously chose to say the (previously) quiet part out loud. It struck "shall be void" and inserted what that meant (as we had explained in *TAMA*): "rescission."

Next, Congress authorized rescission "at the instance of any party." The mention of the "party" raising rescission represents another substantial upgrade from the old Section 47(b), and one that also sets the statute apart from others that we've said fall short of "'rights-creating' language." *Sandoval*, 532 U. S., at 288; see, *e.g.*, *Thompson* v. *Thompson*, 484 U. S. 174, 177, 183 (1988) (no implied private right of action in 28 U. S. C. §1738A, a statute designed to "'avoid jurisdictional competition and conflict between State courts'" and "addressed entirely to States and state courts"). And for all the majority's protestations that Section 47(b) is a "mandate directed to . . . courts, rather than a provision that confers a right on a specified class of persons," *ante,* at 5 (some alterations and internal quotation marks omitted), it fails to account for the fact that we found an implied private right of action in *TAMA* based on language that contained *no* reference to the party raising rescission.

What is more, the majority's insistence that the provision is a rule of decision for courts, not rights-creating language

for parties, *ante*, at 5–6, simply does not track with the or-dinary meaning of the phrase "at the instance of."  See 7 Oxford English Dictionary 1040 (2d ed. 1989) (defining "at the instance of" as "at the solicitation, suit, instigation, or suggestion of"); Webster's New International Dictionary 1287 (2d ed. 1954) (defining "instance" as "[t]he institution and prosecution of a suit").  Also, rescission is an affirma-tive right.  "[A] party believing himself entitled to have the contract abrogated and to have himself restored to his for-mer position *may invoke the aid of a court of equity* and ob-tain a decree for the rescission of the contract and, in proper cases, for the cancellation of the instrument evidencing it." H. Black, Rescission of Contracts and Cancellation of Writ-ten Instruments §1, p. 4 (1916) (Black) (emphasis added); cf. *TAMA*, 444 U. S., at 19, n. 8 (declining to adopt the "anomalous construction" that "Congress intended that claims under §215 would be raised only in state court," thereby "remit[ting] the litigation of a federal right to the state courts," since rescission had customarily been recog-nized as a cause of action).[5]

Then there's the capaciousness of the phrase "any party." "Party" could refer to a party to a contract.  See Brief for Respondents 2.  Or it could refer to a party to a litigation. See Brief for Petitioners 2.  Either way, "any" ensures that, under the statute, rescission can be raised affirmatively or defensively, whether by the shareholder, the investment company, the plaintiff, or the defendant.  The majority's conclusion that the phrase "any party" contemplates only those rescission claims raised defensively is not only

───────────

[5]The majority points out that "[e]lsewhere, [Black's] treatise explains that a party may obtain equitable rescission only if 'he is able to show the existence of some well-recognized title to equitable relief, such as fraud, mistake, or duress.'"  *Ante*, at 6, n. 2 (quoting Black §14).  Fair enough.  But a suit for rescission based on "fraud, mistake, or duress" is still an affirmative suit for rescission.  And the question here is whether Congress intended for a party to be able to file a suit for rescission.

divorced from the text but also illogical given the circumstances. Once a contract "has been performed"—which is the universe in which Section 47(b)(2) operates—what is left to sue about, such that a party with a rescission claim would be in a position to raise it as a defense? By that point, an aggrieved party is most likely to seek rescission affirmatively in order to undo what has already been done.

Section 47(b)'s internal structure provides further support for this reasoning. Whereas Section 47(b)(2) contemplates a legal action to rescind the violative contract *after* it "has been performed," Section 47(b)(1)'s language applies *pre*-performance, warning parties that a contract in violation of the ICA "is unenforceable." Section 47(b)'s paragraphs therefore represent two sides of the same "shall be void" coin, spelled out in more detail than in the original Section 47(b): Neither party may enforce a contract that violates the ICA, but "any party" may seek to rescind such a contract if it has already been performed.

## B

That leaves the broader statutory structure, which the majority says supports its view that Congress did not mean to imply a private right of action. *Ante*, at 6–7. The structure of the ICA cannot bear that weight. True, the Securities and Exchange Commission "bears primary responsibility for ensuring compliance with the ICA." *Ante*, at 7. But unlike the statute at issue in *Sandoval*, which itself "empower[ed] agencies to enforce [the relevant] regulations," Section 47(b) does not contain any remedial scheme specific to its own "substantive rule." 532 U. S., at 289–290. Instead, Section 47(b) uses the phrase "any party"—an odd phrase to denote only the Commission. See *Oxford Univ. Bank* v. *Lansuppe Feeder, LLC*, 933 F. 3d 99, 105–106 (CA2 2019).

The majority also points to the ICA's two express private rights of action, which, it says, show that Congress "'knew

how to'" provide a private remedy expressly and chose not to do so in Section 47(b). See *ante*, at 7 (quoting *Touche Ross*, 442 U. S., at 572). But the express-authorization language upon which the majority hangs this hat concerns private actions principally or exclusively *for damages*, not rescission. See 15 U. S. C. §§80a–35(b), 80a–29(h). And we know from *TAMA* that those two types of relief are not the same. So, one could just as easily infer that, when Congress wanted money damages to flow to private parties in this context, it thought it was necessary to say so. Indeed, in *TAMA*, we cited the two express provisions as a point against finding an implied private right of action for *damages*, but did not invoke them at all in our discussion of whether the IAA created an implied private right of action for *rescission*. See 444 U. S., at 20, and n. 10.

The majority provides no persuasive basis for rejecting that reasoning here. One year after *TAMA*, Congress surely proceeded to amend the ICA feeling safe in the knowledge that a private right of action for rescission had already been established. Congress likely understood—because we had said—that it had to operate expressly only if it wished to extend that right of action to encompass damages as well.

## III

Thus far I have rested my analysis solely on the text, structure, and statutory history of Section 47(b). The fact that the majority nevertheless focuses almost all of its fire on my additional consideration of legislative history should alert readers to the potency of that material in this case. Viewed in conjunction with text, structure, and statutory history, legislative history can be a relevant and reliable indicium of Congress's intent.

A

Rather than guess about what Congress intended Section 47(b) to mean based on what "changed language typically indicates," *ante*, at 10, consider the legislative records in which the Committees spearheading the 1980 amendments explicitly said what they intended. As noted earlier, the relevant House and Senate Committees expressed their "wishes to make clear that private rights of action under [the amendments] should be implied to and in its enforcement to the same extent that such causes of action [were] implied under the [ICA]." S. Rep. No. 96–958, at 14; see also H. R. Rep. No. 96–1341, at 29. I have seldom seen a clearer expression of legislative intent in a congressional record.

The Committees also anticipated and responded directly to the majority's headlining structural argument. The majority reasons that Congress could not have meant to include an implied private right of action for rescission because "the Securities and Exchange Commission bears primary responsibility for ensuring compliance with the ICA." *Ante*, at 6–7. But the Committee Reports explained that, "[w]ith a relatively small staff charged with administrative responsibility for policing potentially unlawful securities-related activities, the Commission [could not] be expected to bring actions against even a large portion of those engaged in schemes, devices and activities that are prohibited by federal law." S. Rep. No. 96–958, at 14; H. R. Rep. No. 96–1341, at 28. So, "private lawsuits serve as an added deterrent to conduct made unlawful by Congress, without the necessity of governmental involvement." *Ibid.*; see also S. Rep. No. 96–958, at 14 (describing private suits as "a necessary adjunct to the Commission's enforcement efforts").

The House Committee, for its part, seemed to view the private right of action we acknowledged in *TAMA* as the bare minimum, not a dispensable option. Its Report noted that, although private suits "significantly assist the

congressional goal of promoting fair corporate suffrage," "in recent years, the Supreme Court [had] turned its focus toward a strict construction of statutory language and expressed intent." H. R. Rep. No. 96–1341, at 28. It then cited *TAMA* as an example of that development—*i.e.*, as illustrative of the Court's refusal to "imply a private cause of action for damages" even on behalf of plaintiffs who "offered to show both that the law was violated and that they suffered monetary loss as a result." H. R. Rep. No. 96–1341, at 28–29, n. 6. The next sentence provided the Committee's reaction: "The Committee wishes to make plain that *it expects the courts to imply private rights of action under this legislation.*" *Id.*, at 29 (emphasis added). Far from rejecting or overturning *TAMA*'s recognition of a private right of action for rescission, the House Committee expressly recognized the rescission right and set its sights on the next goal: ensuring that the courts recognized an implied private right of action for damages.

We have inferred legislative adoption of our holdings from far less. In *Evans* v. *United States*, 504 U. S. 255 (1992), for example, we said that the "silence of the body that is empowered to give us a 'contrary direction' if it does not want the [prevailing judicial interpretation] to survive is consistent with an application of the normal presumption" that Congress has accepted that interpretation. *Id.*, at 269. In the case before us now, there is something much better than "silence": In addition to the text and structure of the amended statute itself, we have legislative history containing an explicit statement from Congress imploring "courts to imply private rights of action under" the amended Section 47(b), and a specific reference to *TAMA* as an example of a judicial decision that found one fewer implied right than Congress wanted. H. R. Rep. No. 96–1341, at 28–29, and n. 6; see also S. Rep. No. 96–958, at 14.

Still, the majority insists that legislative history is irrelevant to properly ascertaining Congress's intent. Its efforts

to neutralize the pellucid statements in this legislative rec-
ord include characterizing them as relating to "implying
causes of action in the 'federal securities laws' generally."
*Ante*, at 12.  But the Reports say what they say.  The Com-
mittees explained that, when it amended the statute we are
interpreting today, Congress wanted to preserve "to the
same extent" the implied private right of action that the
Court had recognized in the ICA.  S. Rep. No. 96–958, at
14.[6]

Unable to explain this compelling evidence of Congress's
intent, the majority pivots to arguing that I "ignor[e]" "[t]he
most relevant portions" of the legislative history.  *Ante*, at
12.  (I welcome the majority's close reading of the Reports.)
According to the majority, the only parts of the Reports that
matter are the ones specifically dedicated to Section 47(b).
*Id.,* at 12.  Those sections say that the new Section 47(b) "is
designed to provide clearer statutory guidance in interpret-
ing [the] equitable rescission remedy."  H. R. Rep. No. 96–
1341, at 27; see S. Rep. No. 96–958, at 10.  In the majority's
view, this section—which "nowhere mentions a private
right of action"—instead "confirm[s] the obvious point that
rescission is a *remedy*."  *Ante*, at 12 (emphasis added).  But
the majority does not, and cannot, explain why the fact that
the Report references a "remedy" matters in the context of
today's dispute.  See n. 6, *supra.*  What is relevant for inter-
preting Section 47(b) is whether a plaintiff *may bring suit*
to seek rescission (however rescission is characterized)—

―――――――
[6] It is true that "the House Report expresses the Committee's expecta-
tion that '[i]n appropriate instances, for example, breaches of fiduciary
duty involving personal misconduct should be remedied under *Section
36(a)* of the Investment Company Act,'" rather than Section 47(b).  *Ante*,
at 13 (emphasis added) (quoting H. R. Rep. No. 96–1341, at 29).  The ma-
jority extrapolates from this that the House Report is irrelevant to Sec-
tion 47(b).  But the majority misses the point.  The House Committee
was providing, yes, an "example"—it referenced Section 36(a) as merely
illustrative of the kinds of circumstances in which courts should allow
private actions under the ICA.  H. R. Rep. No. 96–1341, at 29.

and the answer to that question is clearly yes. See Black §1, p. 4 ("[A] party . . . may invoke the aid of a court of equity and obtain a decree for the rescission of the contract").

The majority's favorite parts of the Reports thus only serve to confirm that Congress was, in fact, thinking about rescission when it amended Section 47(b). And what did Congress know about rescission as relevant to Section 47(b) in 1980? That this Court had found in its language an implied private right of action to seek rescission. See *TAMA*, 444 U. S., at 18–19; H. R. Rep. No. 96–1341, at 28–29, n. 6 (citing *TAMA*).

So, "[o]ne wonders," *ante*, at 13, indeed: If Congress had *not* wished for a private right of rescission to be made available and thus wanted to *undo* our holding in *TAMA*, why did it not say so in the text of the statute or mention that anywhere in the legislative history?

### B

For those who remain unconvinced, I posit that their doubts likely stem from a categorical unwillingness to accept the help of legislative history when interpreting statutes. That is certainly the case for the majority. See *ante*, at 11, 14. But if, as the majority says, it is "mission impossible" to "divin[e] how Congress would have wanted courts to resolve the question presented in this case" with the help of legislative history, *ante*, at 11, a juridical cast of thousands—including many of our illustrious predecessors— has accepted the challenge. Legislative history is a traditional tool courts consult when attempting to ascertain Congress's intent regarding ambiguous statutory text (such as, as relevant here, disputes concerning implied private rights of action). This is a worthy and necessary effort because it

16     FS CREDIT OPPORTUNITIES CORP. *v.* SABA CAPITAL
MASTER FUND, LTD.

JACKSON, J., dissenting

prevents the preferences of judges from supplanting the will of the people.[7]

1

Using legislative history as a tool of statutory interpretation is a time-honored tradition.  Indeed, the Judiciary's collective "old-time devotion" to the legislative-history hymnal, *ante*, at 14, held steady for more than a century—until the late 1980s, when the Court suddenly began to sing a different tune.  See S. Breyer, On the Uses of Legislative History in Interpreting Statutes, 65 S. Cal. L. Rev. 845, 846 (1992) (explaining that the Supreme Court used to rely on legislative history so routinely that a discussion of it appeared "in almost every statutory case [the Court] decided in 1981" and the shift away from legislative history did not begin in earnest until 1989); see also P. Wald, Some Observations on the Use of Legislative History in the 1981 Supreme Court Term, 68 Iowa L. Rev. 195, 197 (1983) (explaining that, in the flurry of legislative activity during the New Deal era and "through the next fifty years, resort to legislative history became pervasive").

It is, in fact, the majority's castigation of legislative history as something verging on extralegal (see, *e.g.*, *ante*, at 14) that is the historical outlier.  And that consternation is especially odd coming from a Court that eagerly delves into the transcripts of the ratification debates, the Framers' private correspondence, and the Federalist Papers to ascertain what the Framers would have "understood," "recognized," and "expected."  *Learning Resources, Inc.* v. *Trump*, 607 U. S. ___, ___ (2026) (slip op., at 6); *Moore* v. *Harper*, 600

———————

[7] A side note: The majority appears to have little problem appreciating the relevance of statutory history, see *ante*, at 10, n. 4, yet balks at the mention of its companion, legislative history.  My point here is that *both* kinds of history are valuable to the interpretive task, and neither should be prohibited.  The majority arbitrarily accepts one while condemning the other.

U. S. 1, 21–22, 26–27 (2023); *U. S. Term Limits, Inc.* v. *Thornton*, 514 U. S. 779, 789–822, 832–838, and nn. 23, 24 (1995).

Courts' traditional use of materials Congress generated while drafting and enacting statutes accords with the "natural" instincts of a judge attempting to "understand the context and purpose" of that law when the text is subject to more than one interpretation. Breyer, 65 S. Cal. L. Rev., at 848. But consulting the legislative record is not just informative. Doing this also serves a vital separation-of-powers function rooted in the structure of our democratic system. As the majority emphasizes from the get-go, "Congress, not the Judiciary, decides" the law. *Ante*, at 1; see also *Brown* v. *United States*, 8 Cranch 110, 128–129 (1814) ("[A]ll . . . questions of policy [are] proper for the consideration of a department which can modify it at will; not for the consideration of a department which can pursue only the law as it is written"). Using legislative history helps prevent judges who are dutybound to interpret Congress's laws from making them instead.

This means that those who find it inappropriate for courts to use legislative history must grapple with the potential consequences of the resulting void. What interest does it really serve to blind ourselves to the congressional record when we interpret Congress's handiwork? Who benefits from that? "Why, of all the many tools judges use to help interpret unclear statutory language (context, tradition, custom, precedent, dictionary meanings, administrability, and so on), should they not use *this* one?" Breyer, 65 S. Cal. L. Rev., at 861 (emphasis added).

There is no flattering or straightforward answer to such questions. That is probably why, for the better part of the 20th century—including after the Court "swor[e] off the habit of venturing beyond Congress's intent" in 1975, see *Sandoval*, 532 U. S., at 287 (citing *Cort* v. *Ash*, 422 U. S. 66, 78 (1975))—courts consulted the legislative history when

called upon to determine Congress's intent to authorize a private right of action. See *Northwest Airlines, Inc.* v. *Transport Workers*, 451 U. S. 77, 91 (1981) (listing, as the relevant considerations in determining "whether Congress intended to create" an implied private right of action, "the language of the statute itself, its legislative history, the underlying purpose and structure of the statutory scheme, and the likelihood that Congress intended to supersede or to supplement existing state remedies"). By my count, the Court relied on legislative history to help determine Congress's intent in more than a dozen implied-private-right-of-action cases after 1975.[8] And why shouldn't we have done so? In this area, all agree that "[s]tatutory intent . . . is determinative." *Sandoval*, 532 U. S., at 286.

To be sure, "legislative history is not the law." *Epic Systems Corp.* v. *Lewis*, 584 U. S. 497, 523 (2018). And no one is arguing that legislative history should trump unambiguous statutory text. But when a statute's text needs

---

[8] *Morse* v. *Republican Party of Va.*, 517 U. S. 186, 232–234 (1996) (opinion of Stevens, J., joined by Ginsburg, J.); *id.*, at 240 (Breyer, J., joined by O'Connor and Souter, JJ., concurring in judgment); *Central Bank of Denver, N. A.* v. *First Interstate Bank of Denver, N. A.*, 511 U. S. 164, 189 (1994); *Virginia Bankshares, Inc.* v. *Sandberg*, 501 U. S. 1083, 1103–1104 (1991); *Thompson* v. *Thompson*, 484 U. S. 174, 179, 183–187 (1988); *Wright* v. *Roanoke Redevelopment and Housing Authority*, 479 U. S. 418, 425, and n. 7 (1987); *Daily Income Fund, Inc.* v. *Fox*, 464 U. S. 523, 536–539 (1984); *Guardians Assn.* v. *Civil Serv. Comm'n of New York City*, 463 U. S. 582, 599–602 (1983) (opinion of White, J., joined by Rehnquist, J.); *id.*, at 609 (Powell, J., joined by Burger, C. J., concurring in judgment); *Jackson Transit Authority* v. *Transit Union*, 457 U. S. 15, 24–28 (1982); *Merrill Lynch, Pierce, Fenner & Smith, Inc.* v. *Curran*, 456 U. S. 353, 382–388 (1982); *Middlesex County Sewerage Authority* v. *National Sea Clammers Assn.*, 453 U. S. 1, 17–18, and n. 27 (1981); *California* v. *Sierra Club*, 451 U. S. 287, 294–296 (1981); *Northwest Airlines, Inc.* v. *Transport Workers*, 451 U. S. 77, 94–95 (1981); *Universities Research Assn., Inc.* v. *Coutu*, 450 U. S. 754, 773–781 (1981); *TAMA*, 444 U. S. 11, 17–18 (1979); *Touche Ross & Co.* v. *Redington*, 442 U. S. 560, 571, n. 11 (1979); *Cannon* v. *University of Chicago*, 441 U. S. 677, 686, n. 7, 694–701 (1979); *Chrysler Corp.* v. *Brown*, 441 U. S. 281, 293–294 (1979).

clarification, discarding legislative history turns the Court's assessment of Congress's intent into a transparently empty gesture. Even worse, it inappropriately elevates the Justices' own power by promoting our views about the "best" policy call. But Congress is not our rival; courts are not in the policymaking arena at all. So we should leave judgment calls about best policies to the Legislature, which routinely creates an illuminating record as part of its legislative process. "Respecting Congress's work product not only makes it more likely that courts will interpret the law in a manner consistent with legislative purposes, but also . . . that Congress will perceive the courts as productive partners rather than as meddlers substituting their own preferences for that of the legislative branch." R. Katzmann, Judging Statutes 10 (2014) (Katzmann).

2

Consistent with the "classic criticism" of courts' use of legislative history, the majority's aversion to the employment of this interpretive tool appears to stem from an intuition that "Congress's subjective intent [is] [un]knowable." *Ante*, at 12. But it is hard to take that criticism seriously when the modern Court nonetheless routinely interprets statutes by speculating about what Congress must have wanted. See, *e.g.*, *Learning Resources*, 607 U. S., at \_\_\_ (plurality opinion) (slip op., at 8) (drawing from a "practical understanding of legislative intent" that "Congress would not have delegated highly consequential power through ambiguous language" (internal quotation marks omitted)).[9]

---

[9] See also, *e.g.*, *Biden* v. *Nebraska*, 600 U. S. 477, 506 (2023) (applying the major questions doctrine to conclude that "'Congress would likely have intended for itself'" the task of making "'[t]he basic and consequential tradeoffs' inherent in a mass debt cancellation program" (quoting *West Virginia* v. *EPA*, 597 U. S. 697, 730 (2022))); *id.*, at 521 (BARRETT, J., concurring) (relying on the absence of "context clues" to determine whether "Congress would have delegated the power to the agency"); *FDA*

Indeed, in this very case the majority purports to know what "Congress intended" when it inserted an "express provision of one method of enforcement" in the ICA. *Ante*, at 7 (internal quotation marks and alterations omitted). It appears, then, that our disagreement today is really about the *tools* courts use to ascertain congressional intent, not its importance or knowability. See *ante*, at 11, n. 5 (characterizing congressional intent drawn from text as "objectified intent" (internal quotation marks omitted)).

On that point, the committee reports that accompany federal statutes are a first-rate indicator of Congress's intent. Committee reports are not a randomly generated collection of Member reflections; these official documents provide crucial information about proposed legislation and thus play a significant role in the legislative process itself. "Committee reports are generally circulated at least two calendar days before legislation is considered on the floor" in order to explain "a bill's context, purposes, policy implications, and details" to Members of Congress and their staffs. Katzmann 20, 130–131, n. 62 (citing A. LaRue, Senate Manual Containing the Standing Rules, Orders, Laws, and Resolutions Affecting the Business of the United States Senate, S. Doc. No. 107–1, p. 17 (2001)). The reports therefore serve as the final sales pitch for a bill, and "there is evidence that lawmakers themselves pay more attention to these reports than a statute's text to understand the statute's purpose and meaning." *Learning Resources, Inc.*, 607 U. S., at ___ (JACKSON, J., concurring in part and concurring in judgment) (slip op., at 2) (citing A. Gluck & L. Bressman, Statutory Interpretation From the Inside—An Empirical Study of Congressional Drafting, Delegation, and the Canons: Part I, 65 Stan. L. Rev. 901, 965–966, 968–969 (2013)); see

_____

v. *Brown & Williamson Tobacco Corp.*, 529 U. S. 120, 160 (2000) ("Congress could not have intended to delegate a decision of such economic and political significance to an agency in so cryptic a fashion").

also Katzmann 37–38. Consequently, quite far from being irrelevant, committee reports often contain the most accurate encapsulation of the legislation's intended meaning.

Given this, it is wrong to suggest that a court's reference to and reliance on statements in committee reports is like picking out friends at a crowded party. *Ante*, at 12. The better analogy is to consulting the user's manual the manufacturer writes to guide piecing together its product. Cf. Gluck & Bressman, 65 Stan. L. Rev., at 978 (explaining that the reports have "internal institutional and implementation-related functions").

Justices have traditionally understood this relatively simple proposition. "'In surveying legislative history we have repeatedly stated that the authoritative source for finding the Legislature's intent lies in the Committee Reports on the bill, which represent the considered and collective understanding of those Congressmen involved in drafting and studying proposed legislation.'" *Digital Realty Trust, Inc.* v. *Somers*, 583 U. S. 149, 170 (2018) (SOTOMAYOR, J., concurring) (quoting *Garcia* v. *United States*, 469 U. S. 70, 76 (1984); alteration and some internal quotation marks omitted). Even Justice Robert Jackson—yes, the very one whose teaching serves as the coda to the majority's denunciation of legislative history, see *ante*, at 14—recognized that reliance on legislative history is "justified where the face of the Act is inescapably ambiguous, and then . . . we should not go beyond Committee reports, which presumably are well considered and carefully prepared." *Schwegmann Brothers* v. *Calvert Distillers Corp.*, 341 U. S. 384, 395 (1951) (concurring opinion).[10]

—————

[10] There's more. See *Simpson* v. *United States*, 435 U. S. 6, 17 (1978) (Rehnquist, J., dissenting) ("The report of a joint conference committee of both Houses of Congress, for example, or the report of a Senate or House committee, is accorded a good deal more weight than the remarks even of the sponsor of a particular portion of a bill on the floor of the

22      FS CREDIT OPPORTUNITIES CORP. *v.* SABA CAPITAL
MASTER FUND, LTD.

JACKSON, J., dissenting

The majority's failure—or refusal—to accept this might stem from what commentators have called a prevailing "academic contempt for Congress." V. Nourse, A Decision Theory of Statutory Interpretation: Legislative History by the Rules, 122 Yale L. J. 70, 142 (2012). Academics may think what they wish of Congress; this Court's jurisprudence ought not be grounded in such contempt. For an institution that purports to "follow the law as written by Congress," *Leal Garcia* v. *Texas*, 564 U. S. 940, 942 (2011) (*per curiam*), it is strange, to say the least, that we give "scant consideration" to "how Congress actually functions." Katzmann 8. The Court should at least endeavor to understand and accurately assess the legislative process from which Section 47(b) arises—so as to better "separate the useful from the misleading," Gluck & Bressman, 65 Stan. L. Rev., at 989— before discarding "the views of the 42-member House Committee on Interstate and Foreign Commerce," *ante*, at 14.

\* \* \*

In his now-famous dissent in *Cannon* v. *University of Chicago*, 441 U. S. 677 (1979), Justice Powell admonished the Court for abandoning "the intent of Congress" and "substitut[ing] its own views as to the desirability of private enforcement." *Id.*, at 740. So it is here. The Court today turns a deaf ear to the unified call of text, statutory structure, and

---

chamber"); *Bank One Chicago, N. A.* v. *Midwest Bank & Trust Co.*, 516 U. S. 264, 276 (1996) (Stevens, J., concurring) ("Legislators, like other busy people, often depend on the judgment of trusted colleagues when discharging their official responsibilities. . . . Representatives and Senators may appropriately rely on the views of the committee members in casting their votes"); *Commissioner* v. *Acker*, 361 U. S. 87, 94 (1959) (Frankfurter, J., dissenting) ("Congress can be the glossator of the words it legislatively uses either by writing its desired meaning, however odd, into the text of its enactment, or by a contemporaneously authoritative explanation accompanying a statute. The most authoritative form of such explanation is a congressional report defining the scope and meaning of proposed legislation").

JACKSON, J., dissenting

history, and substitutes its own views as to the undesirability of private enforcement. Justice Powell's warning remains unheeded, to the detriment of Congress and the private parties it sought to empower.